## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOSHUA TERRERO, | Case No.: |
| Plaintiff, | |
| v. | |
| EXPERIAN INFORMATION SOLUTIONS, INC., EQUIFAX INFORMATION SERVICES, LLC, TRANS UNION, LLC AND CHIME FINANCIAL, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

### COMPLAINT

Joshua Terrero ("Plaintiff" or "Mr. Terrero"), by and through the undersigned counsel, brings this action on an individual basis, against Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); Trans Union LLC ("Trans Union") (collectively, the "Credit Bureau Defendants" or "CRA Defendants"), and Chime Financial, Inc. ("Chime" or "Furnisher Defendant"); and states as follows:

### INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making

by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other PII. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.    The preservation of one's good name and reputation is also at the heart of the

FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all
> sorts of computerized data banks, the individual is in great danger of having his life
> and character reduced to impersonal "blips" and key-punch holes in a stolid and
> unthinking machine which can literally ruin his reputation without cause, and make
> him unemployable or uninsurable, as well as deny him the opportunity to obtain a
> mortgage or buy a home. We are not nearly as much concerned over the possible
> mistaken turn-down of a consumer for a luxury item as we are over the possible
> destruction of his good name without his knowledge and without reason.
> Shakespeare said, the loss of one's good name is beyond price and makes one poor
> indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec.

36570 (1970)] (emphasis added).

8.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine

whether information disputed by consumers is inaccurate and record the current status of the

disputed information, or delete the disputed information, before the end of the 30-day period

beginning on the date on which the CRA receives the notice of dispute from the consumer. This

mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate

information contained within a consumer's credit report is corrected and/or deleted so as to not

prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.    In light of these important findings and purposes, Congress specifically noted "a

need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and

respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.    The FCRA also requires furnishers of information, a creditor or other third party

that provides information about consumer to a CRA, upon notice, to conduct a reasonable

reinvestigation of all disputes with regard to the completeness or accuracy of any information it

3

provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported to Plaintiff's potential creditors inaccurate information related to a previously discharge debt.

12.    Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

14.    The FCRA also requires Furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, materially misleading, or unverifiable after said reinvestigation is completed.

15.    Plaintiff's claims arise out of Experian, Equifax, Trans Union, and Chime plainly deficient reinvestigations considering Plaintiff's disputes.

16.     Accordingly, Plaintiff brings claims against Experian, Equifax, and Trans Union for: 1) failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); and 2) failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate or materially misleading and for failing to delete or note the disputed information from Plaintiffs credit file with a 100 word statement, in violation of the FCRA, 15 U.S.C. § 1681i.

17.     Further, Plaintiff also brings claims against the Furnisher Defendant, for failing to conduct a reasonable investigation to determine whether information Plaintiff disputed was inaccurate or materially misleading for failing to delete the disputed information or modify the trade line on the Plaintiff's credit file, in violation of FCRA, 15 U.S.C. § 1681s-2b.

18.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Defendants for their willful and/or negligent violations of the FCRA, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

19.     Joshua Terrero ("Plaintiff" or "Mr. Terrero") is a natural person residing in Johnston, Rhode Island, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

20.     Defendant Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Rhode Island, including within this District.

21.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating

information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

22.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of Rhode Island, including within this District.

23.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

24.    Defendant Trans Union LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of Rhode Island, including within this District.

25.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

26.    Defendant, Chime is a loan servicer and payment processing company with its principal place of business located at 101 California Street, Suite 500, San Francisco, CA 94111, who regularly transacts business within the state of Rhode Island. Chime is an entity which engages in the practice of furnishing consumer information to consumer reporting agencies, and

is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b), and other sections of the FCRA.  Further, Chime is a "person" as defined by FCRA 1681a(b).

27.     Chime is a "Furnisher" as defined in 12 CFR 1022.41. The Furnisher Defendant regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as Chime, is an entity that reports information about consumers to consumer reporting agencies, which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

<u>**JURISDICTION AND VENUE**</u>

28.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

<u>**FACTS**</u><br>**Summary of the Fair Credit Reporting Act**

30.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

31.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

32.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

33.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

34.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

35.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

36.     The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

37.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

38.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

39.     The Credit Bureau Defendants' consumer reports generally contain the following information:

(a)     Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)     Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)     Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

(d)     Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

40.     The Credit Bureau Defendants obtain consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

41.     The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Credit Bureau Defendants) to make lending decisions.

42.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Credit Bureau Defendants' consumer reports.

43.     The information the Credit Bureau Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

44.     FICO Scores are calculated using information contained in the Credit Bureau Defendants' consumer reports.

45.     The Credit Bureau Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the Credit Bureau Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

46.     The Credit Bureau Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

47.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

48.     The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

49.     The Credit Bureau Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

50.     The Credit Bureau Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

51.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Credit Bureau Defendants for their inaccurate credit reporting.

52.     Thus, the Credit Bureau Defendants are on continued notice of their respective inadequate reporting procedures. Specifically, the Credit Bureau Defendants are on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

53.     The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants reported inaccurate information about them.

## Factual Background

### Plaintiff Notices Misinformation on Credit Report

54.     In or around February 2025, Plaintif received a notice from Chime that he had a payment due.

55.     Shortly thereafter, Plaintiff attempted to make the required payment of $117.

56.     Chime would not allow the payment to be made over the phone, nor would Chime allow the Plaintiff to make the payment through their app.

57.     Plaintiff went to his bank to get a certified bank check to make the required payment and mailed the payment to Chime.

58.     Upon information and belief Chime received the payment.

59.     For an unknown reason, Chime returned the Plaintiff's payment.

60.     Plaintiff then realized that Chime began reporting delinquent payments on his credit reports.

61.     Plaintiff submitted a dispute to the Consumer Financial Protection Bureau ("CFPB") detailing the issues with Chime.

62.     Plaintiff subsequently submitted multiple other disputes with the CFPB.

63.     After going back and forth with Chime, Chime sent the Plaintiff an email dated September 4, 2025 that stated in relevant part: "We've adjusted the information to show that your account has settled with a $0 balance owed to Chime. You do not need to make payment because your account is considered paid in full."

64.     Despite this, the CRA Defendants were still reporting a balance on the Plaintiff's credit reports, as well as the missed payments.

65.     The Plaintiff was shocked and confused to see that this account was showing a balance as he received notice from Chime that the balance was $0 and that the credit reports were going to be updated.

66.     Plaintiff placed many phone calls to Chime to attempt to sort out the mistake, but was unable to do so.

67.     Plaintiff did all that he could to sort out his credit reports and account with Chime, including but not limited to attempting to call Chime, write to Chime through the CFPB, dispute his credit reports directly through the credit reporting agencies, send certified mail to Chime.

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

68.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

69.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

70.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

71.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

72.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

73.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

74.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

75.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

76.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

77.     The data furnishers, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

78.     Once the data furnishers completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Plaintiff's Disputes to all the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting**

79.     In or around September 2025, extremely shocked, surprised, and embarrassed at the Credit Bureau Defendants' inaccurate reporting, Plaintiff disputed the reporting of the Account(s) with the CRA Defendants.

80.     Plaintiff explained that there was an error that this loan had a $0 balance.

81.     The CRA Defendants responded by continuing to report a balance on the account.

82.     After not having his credit reports properly updated, the Plaintiff again disputed the reporting of his Chime accounts with the CRA Defendants, this time via certified mail.

83.     Plaintiff also included a copy of his license and a utility bill to confirm his personal identifying information, as well as a copy of the email from Chime acknowledging a $0 balance.

84.     Plaintiff requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send him a corrected copy of his credit report.

**Defendant Equifax's Unreasonable Reinvestigation**

85.    Upon information and belief, Defendant Equifax received each of the Plaintiff's disputes and supporting documents.

86.    Upon information and belief, Defendant Equifax sent Chime an automated credit dispute verification ("ACDV") pursuant to Plaintiff's September 2025 dispute to Defendant Equifax.

87.    Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

88.    Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's September 2025 dispute.

89.    Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's September 2025 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

90.    Upon information and belief, Defendant Equifax sent Chime an automated credit dispute verification ("ACDV") pursuant to Plaintiff's September 2025 dispute to Defendant Equifax.

91.    After not receiving an update to his Chime Account on his Equifax credit report based on his September 2025 dispute, the Plaintiff mailed a new dispute to Equifax via certified mail in December 2025.

92.    This time, Plaintiff included a copy of the email from Chime detailing the $0 balance on his account.

93.    Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

94.     Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's December 2025 dispute.

95.     Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's December 2025 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### Defendant Experian's Unreasonable Reinvestigation

96.     Upon information and belief, Defendant Experian received each of the Plaintiff's disputes and supporting documents.

97.     Upon information and belief, Defendant Experian sent Chime an automated credit dispute verification ("ACDV") pursuant to Plaintiff's September 2025 dispute to Defendant Equifax.

98.     Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

99.     Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's September 2025 dispute.

100.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's September 2025 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

101.    Upon information and belief, Defendant Experian sent Chime an automated credit dispute verification ("ACDV") pursuant to Plaintiff's September 2025 dispute to Defendant Equifax.

102.    After not receiving an update to his Chime Account on his Experian credit report based on his September 2025 dispute, the Plaintiff mailed a new dispute to Experian via certified mail in December 2025.

103.    This time, Plaintiff included a copy of the email from Chime detailing the $0 balance on his account.

104.    Upon information and belief, Experian received the Plaintiff's December 2025 dispute letter.

105.    Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

106.    Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's December 2025 dispute.

107.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's December 2025 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Reinvestigation**

108.    Upon information and belief, Defendant Trans Union received each of the Plaintiff's disputes and supporting documents.

109.    Upon information and belief, Defendant Trans Union sent Chime an automated credit dispute verification ("ACDV") pursuant to Plaintiff's September 2025 dispute to Defendant Equifax.

110.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

111.    Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's September 2025 dispute.

112.    Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's September 2025 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

113.    Upon information and belief, Defendant Trans Union sent Chime an automated credit dispute verification ("ACDV") pursuant to Plaintiff's September 2025 dispute to Defendant Equifax.

114.    After not receiving an update to his Chime Account on his Trans Union credit report based on his September 2025 dispute, the Plaintiff mailed a new dispute to Trans Union via certified mail in December 2025.

115.    This time, Plaintiff included a copy of the email from Chime detailing the $0 balance on his account.

116.    Upon information and belief, Trans Union received the Plaintiff's December 2025 dispute letter.

117.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

118.    Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's December 2025 dispute.

119.    Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's December 2025 dispute, or any reinvestigation whatsoever, to determine whether the disputed

information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### The Furnisher Defendants' Unreasonable Dispute Investigations

120.    Upon information and belief, the Furnisher Defendant Chime failed to adequately review all of the information provided to them by Plaintiff.

121.    Upon information and belief, the Furnisher Defendant Chime verified the disputed late payments as accurate in response to Equifax, Experian, and Trans Union's ACDVs.

122.    Chime refused to update the Plaintiff's credit reports to reflect a $0 balance, despite issuing an email to the Plaintiff acknowledging that the balance on his Chime account was $0.

123.    Furnisher Defendant Chime violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it.

### Capital One denied the Plaintiff for an increase to his credit limit.

124.    In or around December 2025, the Plaintiff was interested in increasing his credit limit on his Capital One Credit Card.

125.    In or around December 2025, the Plaintiff applied for a credit limit increase with Capital One.

126.    For Capital One to make a determination on Plaintiff's credit, it would need to obtain copies of his credit files. Plaintiff provided Capital One with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

127.    Upon information and belief in or around December 2025, CRA Defendants sold a

credit report about Plaintiff to Capital One in response to Plaintiff's credit application.

128.    Upon information and belief, in or around December 2025, Capital One communicated that the Plaintiff would not qualify for a credit line.

129.    Upon information and belief, the information that was provided to Capital One from the CRAs in relation to Plaintiff's communications contained the missed payments and a balance of the Chime account, despite the account having a $0 balance.

130.    It was inaccurate for the CRAs to publish information to a third party that contained fraudulent account information.

131.    The CRAs violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

132.    The CRAs violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

133.    Plaintiff reasonably believes that the Credit Bureau Defendants continued to publish that Plaintiff had a balance and missed payments, despite receiving a letter from Chime indicating that the balance on the account was $0.

134.    As a result of the reported balance and missed payment status, the Defendants made it practically impossible and complicated for Plaintiff to continue to obtain credit or open new accounts.

135.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

136.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

137.    As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

138.    The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

139.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate

credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

**Capital One again denied the Plaintiff for an increase to his credit limit in January 2026**

140.    In or around January 2026, the Plaintiff was again interested in increasing his credit limit on his Capital One Credit Card.

141.    In or around January 2026, the Plaintiff again applied for a credit limit increase with Capital One.

142.    For Capital One to make a determination on Plaintiff's credit, it would need to obtain copies of his credit files. Plaintiff provided Capital One with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

143.    Upon information and belief in or around January 2026, CRA Defendants sold a credit report about Plaintiff to Capital One in response to Plaintiff's credit application.

144.    Upon information and belief, in or around January 2026, Capital One communicated that the Plaintiff would not qualify for a credit line.

145.    Upon information and belief, the information that was provided to Capital One from the CRAs in relation to Plaintiff's communications contained the missed payments and a balance of the Chime account, despite the account having a $0 balance.

146.    It was inaccurate for the CRAs to publish information to a third party that contained fraudulent account information.

147.    The CRAs violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published

and maintained concerning Plaintiff.

148.    The CRAs violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

149.    Plaintiff reasonably believes that the Credit Bureau Defendants continued to publish that Plaintiff had a balance and missed payments, despite receiving a letter from Chime indicating that the balance on the account was $0.

150.    As a result of the reported balance and missed payment status, the Defendants made it practically impossible and complicated for Plaintiff to continue to obtain credit or open new accounts.

151.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

152.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

153.    As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by §

1681i(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

154.    The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

155.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

### Plaintiff Sustained Damages as a Result of the Defendants' Conduct

156.    Plaintiff did exactly what he should have done in disputing the information on his credit reports.

157.    Plaintiff did exactly what she should have done to dispute the incorrect and/or materially misleading information contained within his credit files.

158.    Plaintiff disputed with the CRA Defendants.

159.    Plaintiff disputed directly with Chime.

160.    Plaintiff submitted disputes to the CFPB.

161.    Despite Plaintiff's disputes of the inaccurate Chime account, Experian Equifax, and Trans Union hardly waivered in their refusal to block or change the reporting of the account.

162.    Upon information and belief, Experian, Equifax, and Trans Union continue to report the inaccurate Chime account on Plaintiff's credit reports.

163.    As a result of the Defendants' conduct, Plaintiff sustained severe emotional distress. Specifically, Plaintiff has spent an inordinate amount of time dealing with the stress and anxiety caused by the false reporting from the Defendants.

164.    Plaintiff suffered from countless nights of poor sleep, no sleep, or interrupted sleep as his mind frequently drifts to thoughts of the issues with his credit report, future issues caused by Defendants, and/or other related matters.

165.    Plaintiff reasonably believes that the Furnisher Defendant Chime failed to conduct reasonable investigations with her disputes, failed to have the disputed incorrect or materially misleading Account removed or modified from Plaintiff's Experian, Equifax, and Trans Union credit files, and in fact, verified the account as accurate to Defendant Equifax, Experian, and Trans Union and in so doing inaccurately suggested that Plaintiff was responsible for the mistaken credit reports.

166.    Due to Defendants' ardent refusal to comply with their respective obligations pursuant to the FCRA, Plaintiff was forced to obtain legal advice and counsel, for which he incurred attorney's fees.

167.    Further, upon information and belief, Plaintiff was denied credit due to Defendants' inexplicable refusal to remove the incorrect and/or materially misleading Account from his credit file.

168.    Defendants' conduct disrupted Plaintiff's life.

169.    In addition to impacting his work productivity and income, dealing with the consequences of Defendants' conduct has taken Plaintiff away from time she would otherwise have spent with his friends and family. Plaintiff has reasonably lost countless hours suffering and worrying over whether her credit report would be properly corrected.

170.    Defendants' conduct has caused Plaintiff extreme and ongoing stress and anxiety. Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that Defendants would ever properly reinvestigate his disputes. Further, Plaintiff reasonably believes that the Chime Account have negatively impacted and depressed his credit score.

171.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

172.    At all times pertinent hereto, the conduct of Defendants, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

173.    Plaintiff's ongoing stress and anxiety over the situation, and after repeatedly receiving one non-responsive communication after another from Defendants, Plaintiff feels a surge of panic each time she receives another communication from Defendants. His ongoing stress and anxiety regarding the situation has affected her and her relationships negatively.

174.    As a standard practice, the CRA Defendants do not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the data furnishers, despite numerous court decisions admonishing this practice. See *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a)

must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

175.    The Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Defendants' violations of the FCRA are willful.

176.    The Defendants' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

177.    As a result of the Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to her credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the Account, the expenditure of labor and effort disputing and trying to remove the Account.

178.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment whose veracity is doubted, questioned and disbelieved by the Defendants.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

179.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

180.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

181.    On numerous occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiff.

182.    Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

183.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

184.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

185. Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

186. As a result of Defendants' Equifax, Experian, and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and less favorable terms.

187. Defendants Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

188. Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

189. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

190. The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a

consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id.*

191. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

192. On at least one occasion during the past two years, Plaintiff disputed the inaccurate information with Equifax, Experian, and Trans Union and requested that they correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him.

193. In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

194. In response to Plaintiff's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

195. In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

196. The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from

Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

197.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

198.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

199.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### 15 U.S.C. § 1681s-2(b)
**Failure to Conduct an Investigation of the Disputed Information and Review of all Relevant Information Provided by the Consumer**
**(Chime Only)**

200.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

201.    The Furnisher Defendant Chime caused the incorrect and/or materially misleading Account to be added to Plaintiff's credit file with the national credit bureaus, including but not limited to the CRA Defendants.

202.     Defendant Chime violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to the CRA Defendants; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to the CRA Defendants.

203.     As a result of the Furnisher Defendant Chime's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the incorrect and/or materially misleading account; and, the expenditure of labor and effort disputing and trying to remove the incorrect and/or materially misleading account.

204.     Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment whose veracity is doubted, questioned and disbelieved by the Furnisher Defendant.

205.     Furnisher Defendant Chime's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Furnisher Defendant Chime was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

206.     Plaintiff is entitled to recover attorneys' fees and costs from Furnisher Defendant

Chime in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Defendants negligently and/or willfully violated the FCRA;

ii.  Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.  Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: February 3, 2026,

> */s/Matthew McKenna*
> Matthew McKenna, RI No. 10320
> SHIELD LAW
> 157 Belmont Street
> Brockton, MA 02301
> T: (262) 420-5953
> E: matt@shieldlaw.com
>
> *Attorney for Plaintiff,*
> *Joshua Terrero*